In the Matter of the Claim of Antoinette Yannon, Respondent, v New York Telephone Company, Appellant. Workers' Compensation Board, Respondent.

Third Department, May 6, 1982

**APPEARANCES OF COUNSEL**

*Harold S. Levy* (*Saul Scheier* and *Paul F. McAloon* of counsel), for appellant.

*Robert Abrams, Attorney-General* (*Howard B. Friedland* and *Henriette Frieder* of counsel), for Workers' Compensation Board, respondent.

**OPINION OF THE COURT**

Kane, J.

Claimant is the widow of Samuel Yannon, a former employee of the New York Telephone Company, who died on June 10, 1974. From 1955 until the early part of 1968, decedent was a radio technician assigned to a special service unit which monitored and repaired microwave transmission units at the employer's television transmission facility located on the 87th floor of the Empire State Building. Except for rare occasions when decedent worked on units in the field, he worked exclusively at this facility on a daily basis, with considerable overtime. The tenure of his co-workers generally did not exceed three years.

There were 25 microwave units at the facility, spaced about five feet apart, each with its parabolic reflecting dish

facing the outer glass wall of the building. Protruding from the center of each reflecting dish was a "feedhorn" antenna from which microwave transmissions could be beamed out to or received from other locations. Behind the center of each dish, enclosed in a housing, was a klystron tube, which was the power source of the unit that emitted the microwave transmissions. Among decedent's duties was the tuning, repairing and aligning of these microwave units. Access to the "feedhorn" antennas was by means of a "walkable area" between the glass wall of the building and the parabolic reflecting dishes, while the klystron tubes could be reached from the interior console area. The tuning process was performed two or three times each day and required approximately 20 minutes on each occasion. The tube emitted microwaves as it was tuned, while the antenna was supposed to be turned off during such adjustments. One of the crucial questions presented, and one which resulted in conflicting views, was the amount of microwave radiation to which decedent was exposed; whether it exceeded permissible standards, and whether those standards themselves are within acceptable levels.

Prior to 1968 decedent's health was good. However, early that year, at the age of 57, he began to suffer a drastic deterioration of his hearing, sight and co-ordination to such an extent that he was unable to perform his duties, requiring his placement on disability leave. He was retired on July 7, 1971, and died three years later after a prolonged period of progressive physical and mental deterioration. The hospital records where decedent was confined indicate that he suffered from an "organic brain syndrome" or a "degenerative central nervous system disease" or a "chronic brain syndrome" of unknown etiology. There were, however, references in the record, by attending physicians, that decedent's symptomology could be related to microwave exposure. On January 11, 1975, the claimant widow filed her claim for death benefits, contending that decedent's death resulted from his exposure to microwave radiation.

The testimony at the numerous workers' compensation hearings, both lay and expert, was lengthy and conflicting. The Administrative Law Judge awarded claimant benefits

and the board affirmed, finding that decedent's death resulted from an occupational radiation disease, one within the meaning of section 3 (subd 2, par 30) of the Workers' Compensation Law, and that said disease and his ultimate death were directly related to his exposure to microwave radiation while employed by the New York Telephone Company.

On this appeal, we must first consider whether the record demonstrates the existence of a recognizable occupational disease identified as "microwave radiation sickness" and, if so, whether decedent was so inflicted. In order to be so identified, such a disease must actually be caused by the employment and from the particular work the employee is performing. It must result from the nature of the employment and as a natural incident thereof (*Matter of Goldberg v 954 Marcy Corp.*, 276 NY 313). It cannot be founded upon the aggravation of a pre-existing condition which is not occupational in nature. In other words, "[t]here must be a recognizable link between the disease and some distinctive feature of the claimant's job" (*Matter of Detenbeck v General Motors Corp.*, 309 NY 558, 560).

Claimant's leading expert, Dr. Milton Zaret, provided the board with ample evidence of the existence of a disease identified as "microwave or radiowave sickness". Dr. Zaret's own studies, including those performed for the United States Government, and excerpts of reports from the Warsaw Conference of 1973 which documented the diagnosis of such a disease in other countries, substantiate this conclusion. The board was entitled to credit his testimony and that of other experts supporting this view.

Whether claimant was so inflicted with this disease presents a more difficult question. The employer's experts, also eminently qualified, steadfastly maintained that decedent suffered from Alzheimer's disease which caused presenile dementia, retinitis pigmentosa and generalized arteriosclerosis. This conclusion also finds ample support in the record. However, our review is limited to whether there is substantial evidence in the record to support the board's decision, not whether upon this record the court would have come to a different conclusion (*Matter of Palermo v Gallucci & Sons*, 5 NY2d 529).

The requisite proof that decedent's death was causally related to exposure to microwave radiation during the course of employment presents another troublesome issue. The employer contends that there is no evidence of exposure to unsafe levels of radiation. However, the accuracy of the measurements of radiation taken by the employer is in issue, as well as the number of microwave units in operation when measurements were taken. Moreover, there was expert testimony that even at permissible levels, exposure over a prolonged period of time could produce long-term harmful effects. Here, the exact proof of the amount of radiation to which decedent was exposed is not available (see *Matter of Murphy v Beaunit Fibers,* 42 AD2d 1009). However, the present state of scientific knowledge has not advanced to the point where exactitude exists in fixing the limits of microwave radiation on the human body. This does not mean that the testimony of recognized experts should be rejected where their views are supported by a record that presents arguable issues as to the degree of radiation, as long as there is substantial evidence to support these views after a study of all the salient material available (*Matter of Besner v Kiddie Nuclear Lab.,* 24 AD2d 1045; *Matter of Matthews v General Elec. Co.,* 2 AD2d 623; *Matter of Zaepfel v du Pont de Nemours & Co.,* 284 App Div 693, affd 309 NY 962).

Finally, upon the entire record and with the assistance provided by the applicable presumption, we conclude that there is substantial evidence to establish the necessary causal relationship between decedent's exposure to microwave radiation, the development of the within occupational disease and his ultimate death (Workers' Compensation Law, § 47; *Matter of Lapinsky v Ardom Bake Shop,* 18 AD2d 850, affd 13 NY2d 1163). While the hospital records indicate preliminary conclusions that decedent's condition was idiopathic, the record, as developed, supports the board's decisions.

The decisions should be affirmed, with costs to the Workers' Compensation Board.

MAHONEY, P. J., SWEENEY, CASEY and MIKOLL, JJ., concur.

Decisions affirmed, with costs to the Workers' Compensation Board.